**Nos. 26-1860, 26-1863**

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,
*Plaintiff-Appellee*,

v.

DREW HOWARD WRIGLEY, in his official capacity as Attorney General of North Dakota; TANYA L. SCHMIDT, in her official capacity as Board President of the North Dakota Board of Pharmacy; MARK J. HARDY, in his official capacity as Executive Director of the North Dakota Board of Pharmacy; and CAROLYN BODELL, TYLER LANNOYE, SHANE R. WENDELL, KEVIN J. OBERLANDER, DIANE HALVORSON, and RON HORNER, in their official capacities as Members of the North Dakota Board of Pharmacy,
*Defendants-Appellants*,

AMERICAN HOSPITAL ASSOCIATION; 340B HEALTH; AMERICAN SOCIETY OF HEALTH-SYSTEM PHARMACISTS; NORTH DAKOTA HOSPITAL ASSOCIATION,
*Amici on Behalf of Appellants.*

(*Additional Caption on Inside Cover*)

On Appeal from the United States District Court for the
District of North Dakota,
Nos. 1:25-cv-0008, 1:25-cv-00204

**BRIEF FOR PLAINTIFF-APPELLEE PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA**

ERIN E. MURPHY
*Counsel of Record*
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Pharmaceutical Research and Manufacturers of America*

August 20, 2026

26-1863

ABBVIE, INC., a Delaware corporation; PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA; ALLERGAN, INC., a Delaware corporation; DURATA THERAPEUTICS, INC., a Delaware corporation; ABBVIE PRODUCTS, LLC, a Georgia limited liability company; PHARMACYCLICS, LLC, a Delaware limited liability company; ALLERGAN SALES, LLC, a Delaware limited liability company,

*Plaintiffs-Appellees*,

and

ASTRAZENECA PHARMACEUTICALS, LP,

*Plaintiff*,

v.

DREW HOWARD WRIGLEY, in his official capacity as Attorney General of the State of North Dakota; TANYA L. SCHMIDT, in her official capacity as Board President of the North Dakota Board of Pharmacy; and CAROLYN BODELL, TYLER LANNOYE, SHANE R. WENDELL, KEVIN J. OBERLANDER DIANE HALVORSON, and RON HORNER, in their official capacities as Members of the North Dakota Board of Pharmacy; MARK J. HARDY, in his official capacity as Member of the North Dakota Board of Pharmacy,

*Defendants-Appellants*.

AMERICAN HOSPITAL ASSOCIATION; 340B HEALTH; AMERICAN SOCIETY OF HEALTH-SYSTEM PHARMACISTS; NORTH DAKOTA HOSPITAL ASSOCIATION,

*Amici on Behalf of Appellants.*

## SUMMARY OF THE CASE & REQUEST FOR ORAL ARGUMENT

North Dakota recently enacted a law that singles out drug manufacturers who participate in a federal healthcare program for burdensome regulations. That law cannot be squared with fundamental Supremacy Clause principles, which prohibit states from discriminating against those with whom the federal government deals, from impeding the federal government's conduct, and from regulating in areas of uniquely federal interest. As the district court correctly concluded, North Dakota's law does all these things. It also conflicts in several respects with the federal statutory regime. And it runs headlong into the Commerce Clause by directly regulating wholly out-of-state transactions between out-of-state entities.

While this Court has recently upheld two state laws that bear some similarities, the district court concluded that North Dakota's law differs in critical respects, and that the parties here raised arguments that this Court's decisions in those cases did not consider. The district court also consolidated this case with cases filed by two other plaintiffs, so there are multiple sets of Plaintiffs/Appellees. Pharmaceutical Research and Manufacturers of America ("PhRMA") accordingly respectfully requests that the Court grant each side a total of 30 minutes of oral argument, which will ensure that the Court can adequately explore with all of the parties all of the distinct constitutional issues that this appeal presents.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), PhRMA certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS


SUMMARY OF THE CASE & REQUEST FOR ORAL ARGUMENT .................. i

CORPORATE DISCLOSURE STATEMENT .................. ii

TABLE OF AUTHORITIES .................. v

JURISDICTIONAL STATEMENT .................. 1

STATEMENT OF THE ISSUES .................. 1

INTRODUCTION .................. 2

STATEMENT OF THE CASE .................. 6

A. Factual Background .................. 6

B. Proceedings Below .................. 14

SUMMARY OF ARGUMENT .................. 21

STANDARD OF REVIEW .................. 25

ARGUMENT .................. 25

I. H.B. 1473 Unconstitutionally Rewrites The Terms Of Participation In A Federal Spending-Power Program .................. 25

A. The Supremacy Clause Forecloses State Efforts to Single Out Federal Programs and Their Participants for Special Restrictions .................. 26

B. H.B. 1473 Unconstitutionally Singles Out the Federal 340B Program and Its Participants for Special Restrictions .................. 35

C. This Court's Prior 340B Cases Do Not Hold Otherwise .................. 38

II. At The Absolute Least, H.B. 1473's Distinct Claims-Data And Rebate Provisions Are Preempted .................. 45

A. H.B. 1473's Prohibition on Claims-Data Conditions Is Preempted .................. 46

B. H.B. 1473 Conflicts With Federal Law By Criminalizing the Use of Rebates in the 340B Program ................................................ 50

III. PhRMA Is Entitled To Judgment On Its Commerce Clause Claim ............. 53

CONCLUSION ........................................................................................ 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*AbbVie Inc. v. Drummond*,
808 F.Supp.3d 1266 (W.D. Okla. 2025) ....................................................46

*Arizona v. Bowsher*,
935 F.2d 332 (D.C. Cir. 1991) ....................................................37

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025).................................................... 53, 54, 55

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018)....................................................53

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) .................................................... 6, 7, 44

*Barnett Bank of Marion Cnty., N.A. v. Nelson*,
517 U.S. 25 (1996)....................................................51

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014).................................................... 28, 37

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001).................................................... 28, 31

*Clearfield Tr. Co. v. United States*,
318 U.S. 363 (1943)....................................................30

*CoreCivic, Inc. v. Governor of New Jersey*,
145 F.4th 315, (3d. Cir. 2025).................................................... 28, 35

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)....................................................50

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022)....................................................6

*Davison v. City of Minneapolis*,
490 F.3d 648 (8th Cir. 2007)....................................................25

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003) ........................ *passim*

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992) ........................ 44

*GEO Grp. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ........................ 26

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) ........................ 6

*In re J.B.*,
959 N.W.2d 869 (N.D. 2021) ........................ 53

*Iowa Migrant Movement for Just. v. Bird*,
157 F.4th 904 (8th Cir. 2025) ........................ 52

*Johnson v. Exide Techs., Inc.*,
137 F.4th 676 (8th Cir. 2025) ........................ 25

*Johnson v. Maryland*,
254 U.S. 51 (1920) ........................ 34

*Landor v. La. Dep't of Corrs. & Pub. Safety*,
146 S.Ct. 1931 (2026) ........................ 31, 32

*Lapides v. Bd. of Regents*,
535 U.S. 613 (2002) ........................ 51

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
469 U.S. 256 (1985) ........................ 30

*Mayo v. United States*,
319 U.S. 441 (1943) ........................ 28

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ........................ 26

*Napier v. Atl. Coast Line R. Co.*,
272 U.S. 605 (1926) ........................ 44

*NFIB v. Sebelius*,
567 U.S. 519 (2012)....................................................................................7

*Novartis Pharms. Corp. v. Hanaway*,
180 F.4th 1097 (8th Cir. 2026).................................................................*passim*

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) ...............................................................*passim*

*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990)..................................................................................30

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)......................................................................................31

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*,
361 U.S. 376 (1960)..................................................................................29

*PhRMA v. McClain*,
95 F.4th 1136 (8th Cir. 2024)....................................................................*passim*

*PhRMA v. McCuskey*,
171 F.4th 675 (4th Cir. 2026)....................................................................37

*PhRMA v. Morrisey*,
760 F.Supp.3d 439 (S.D. W. Va. 2024)..................................................... 46, 48

*PhRMA v. Walsh*,
538 U.S. 644 (2003)..................................................................................32

*Prince v. Kids Ark Learning Ctr.*,
622 F.3d 992 (8th Cir. 2010)......................................................................41

*Rodgers v. Bryant*,
942 F.3d 451 (8th Cir. 2019)......................................................................52

*Rust v. Sullivan*,
500 U.S. 173 (1991)..................................................................................30

*Sanofi-Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023).......................................................................*passim*

*Skelton v. Henry*,
390 F.3d 614 (8th Cir. 2004).....51

*United Food & Com. Workers Int'l Union v. IBP, Inc.*,
857 F.2d 422 (8th Cir. 1988).....52

*United States v. Bruguier*,
735 F.3d 754 (8th Cir. 2013).....41

*United States v. King Cnty.*,
122 F.4th 740 (9th Cir. 2024).....27

*United States v. Metro. St. Louis Sewer Dist.*,
578 F.3d 722 (8th Cir. 2009).....51

*United States v. Mitchell*,
271 U.S. 9 (1926).....41

*United States v. Standard Oil Co.*,
332 U.S. 301 (1947).....30

*United States v. Washington*,
596 U.S. 832 (2022)..... *passim*

*XO Mo., Inc. v. City of Maryland Heights*,
362 F.3d 1023 (8th Cir. 2004).....53

**Statutes**

42 U.S.C. §1320f-2(d).....48

42 U.S.C. §1320f-3(a).....48

42 U.S.C. §1396r-8(a)(1).....6

42 U.S.C. §1396r-8(a)(5).....6

42 U.S.C. 256b.....16

42 U.S.C. §256b(a)(1)..... 5, 6, 7, 50

42 U.S.C. §256b(a)(4).....7

42 U.S.C. §256b(a)(5).....8

42 U.S.C. §256b(d)(3) .......... 47

Ark. Code §23-92-604(c) .......... 14

N.D. Cent. Code §12.1-32-01(6) .......... 17

N.D. Cent. Code §43-15.3-08(3)(a) .......... 16, 35

N.D. Cent. Code §43-15.3-08(3)(b) .......... *passim*

N.D. Cent. Code §43-15.3-09(1) .......... 17

N.D. Cent. Code §43-15.3-09(2) .......... 17

**Regulations**

42 C.F.R. §10.21 .......... 9

42 C.F.R. §10.23 .......... 9

42 C.F.R. §10.23(c) .......... 9

61 Fed. Reg. 43,549 (Aug. 23, 1996) .......... 10

61 Fed. Reg. 65,406 (Dec. 12, 1996) .......... 9, 47

75 Fed. Reg. 10,272 (Mar. 5, 2010) .......... 10, 11

91 Fed. Reg. 48,883 (Aug. 3, 2026) .......... 5, 49, 50, 51

**Other Authorities**

340B ESP, *340B ESP Resources*, https://perma.cc/46M7-GTPF .......... 13

Ark.Br., *PhRMA v. McClain*, 2023 WL 3010602 (8th Cir. Apr. 10, 2023) .......... 42

Compl., *Arkansas v. AbbVie, Inc.*, No. 57CV-26-84 (Polk Cnty. Cir. Ct. July 21, 2026) .......... 16

Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Pricing Negotiation Final Guidance* (Oct. 2, 2024), https://perma.cc/Q8KB-LLYE .......... 48

CVS, *Annual Report (Form 10-K)* (2024), https://perma.cc/J5GD-WB5H .......... 12

Adam J. Fein, *New HRSA Data: 340B Program Reached $29.9 Billion in 2019*, Drug Channels (June 9, 2020), https://perma.cc/B759-WJTZ .................11

H.R. Rep. No. 102-384(II) (1992) ........................................................................8

Majority Staff Rep. of S. Comm. on Health, Educ., Lab. & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* (2025), https://perma.cc/C83U-VRPX...................................11

Sample PPA Addendum, https://tinyurl.com/3d4v326h .................................... 7, 36

Sample PPA, https://tinyurl.com/4xbmd72k...............................................................7

U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* (2018), https://perma.cc/BK6S-WG5M.............................11

Walgreens, *Annual Report (Form 10-K)* (2024), https://perma.cc/YFA8-HNPE .......................................................................12

## JURISDICTIONAL STATEMENT

North Dakota removed this case to federal court under 28 U.S.C. §1441 on August 20, 2025, because PhRMA's complaint raised federal questions. 25-cv-204.R.Doc.1-1. The district court entered final judgment for PhRMA on April 27, 2026; the state noticed its appeal two days later. Add.1, App.1327, 25-cv-81.R.Doc.83; App.85, 25-cv-81.R.Doc.85. This Court has appellate jurisdiction under 28 U.S.C. §1291. North Dakota's assertion that appellate jurisdiction arises from 28 U.S.C. §1292(a)(1), N.D.Br.5-6, is mistaken.

## STATEMENT OF THE ISSUES

1. Whether, as the district court held, North Dakota House Bill 1473 violates the Supremacy Clause.

*United States v. Washington*, 596 U.S. 832 (2022); *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003); *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024); *Novartis Pharmaceuticals Corp. v. Hanaway*, 180 F.4th 1097 (8th Cir. 2026).

2. Whether, as the district court held, North Dakota House Bill 1473 violates the Commerce Clause.

*Association for Accessible Medicines v. Ellison*, 140 F.4th 957 (8th Cir. 2025); *Hanaway*, 180 F.4th 1097.

## INTRODUCTION

The Supreme Court has long held that the Constitution itself displaces state laws that single out those who deal with the federal government for special burdens, directly target the federal government, or intrude upon an area of uniquely federal interest. The law at issue here does all those things. North Dakota House Bill 1473 (2025) ("H.B. 1473") is not a generally applicable law that regulates parties irrespective of their federal status or their conduct irrespective of federal law. H.B. 1473 singles out pharmaceutical manufacturers for special regulation *only* if they participate in the 340B Drug Pricing Program, a federal spending-power program under which manufacturers, in exchange for the federal government's agreement to reimburse their drugs under Medicare and Medicaid, agree to offer to sell their drugs to certain non-profit healthcare providers (called "covered entities") at exceptionally reduced prices (called "340B prices" or "ceiling prices"). And H.B. 1473 regulates *only* conduct that manufacturers take pursuant to their obligations under that federal program. The Supremacy Clause does not countenance that kind of state effort to reset the terms of participation in a federal program.

This Court has recently confronted two other state laws that, like H.B. 1473, regulate certain aspects of manufacturers' participation in 340B. *See PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024); *Novartis Pharms. Corp. v. Hanaway*, 180 F.4th 1097 (8th Cir. 2026). PhRMA respectfully disagrees with those decisions,

which upheld Arkansas's and Missouri's 340B laws. But neither *McClain* nor *Hanaway* confronted an argument that the Supremacy Clause forbids states from "singl[ing] out" participants in federal spending-power programs for special regulations absent a "clear congressional mandate" authorizing such laws. *United States v. Washington*, 596 U.S. 832, 839-40 (2022). That bedrock nondiscrimination rule dooms H.B. 1473, which is a naked effort to interfere with the federal 340B Program—a purely federal-private partnership in which Congress gave states no role. As the district court (Traynor, J.) explained, North Dakota's law "directly alters manufacturer[s']" obligations only if and when they participate in that federal program. Add.4, 18-19, App.1330, 1344-45, 25-cv-81.R.Doc.83 at 4, 18-19. H.B. 1473 thus runs headlong into the prohibition on singling out federal partners for additional state-law obligations.

On top of that, North Dakota has conceded that its law does not operate how this Court concluded the laws at issue in *McClain* and *Hanaway* operate. To be sure, H.B. 1473's contract-pharmacy provision is similar in some respects to Arkansas's and Missouri's laws. But this Court held in *McClain* and *Hanaway* that those laws regulate only "the delivery of a covered entity's 340B drugs to contract pharmacies," not the circumstances under which a drug must be sold at the 340B price. *McClain*, 95 F.4th at 1145; *see Hanaway*, 180 F.4th at 1113-14. *McClain* and *Hanaway* thus understood Arkansas's and Missouri's laws to kick in only *after* a manufacturer has

sold its drugs to a covered entity at the 340B price, requiring manufacturers only to deliver those drugs to the pharmacy of a covered entity's choosing.

That is decidedly not how H.B. 1473 works. Indeed, when PhRMA suggested otherwise below, North Dakota adamantly disagreed, insisting that H.B. 1473 instead regulates what "pre-sale conditions" manufacturers may impose on their offers to sell "drugs *available to be purchased* at 340B program prices." Add.18, App.1344, 25-cv-81.R.Doc.83 at 18. The state admits the same on appeal, conceding that H.B. 1473 "prevents manufacturers from imposing restrictive policies and limitations" on "the 340B pricing and sale agreements that they enter with North Dakota covered entities." N.D.Br.45-46 (emphasis omitted). And that difference matters, as it means that North Dakota's law regulates when manufacturers must *sell* their drugs at the 340B price, which is an issue on which Congress has very much spoken.

At the absolute least, this Court should affirm with respect to the two distinct provisions of North Dakota's law that find no analogue in Arkansas's and Missouri's statutes. The first prohibits manufacturers from conditioning their offers to sell at 340B prices on covered entities' agreement to provide claims data regarding the patients to whom drugs are dispensed at 340B prices. N.D. Cent. Code §43-15.3-08(3)(b)(3). That prohibition is not about where drugs will be delivered; it is about what information covered entities must supply if they want 340B prices. And it

squarely interferes with Congress's enforcement regime, as it impedes the ability of manufacturers to utilize the audit and administrative dispute resolution rights Congress gave them to help detect and deter fraud and abuse in the 340B Program. North Dakota's law also forbids manufacturers from providing 340B pricing via a rebate instead of as an up-front discount. *Id.* §43-15.3-08(3)(b)(5). That too squarely conflicts with federal law, as Congress has determined that rebates can be an appropriate way to provide 340B pricing, *see* 42 U.S.C. §256b(a)(1), and the federal agency tasked with administering the 340B Program expressly permits manufacturers to provide 340B pricing to covered entities via rebates—because it has concluded that doing so helps deter and detect abuse, *see* 91 Fed. Reg. 48,883, 48,887 (Aug. 3, 2026).

Finally, the district court also correctly held that H.B. 1473 directly regulates wholly out-of-state transactions in violation of the Commerce Clause. While this Court rejected a similar argument in *Hanaway*, it did so on the ground that Missouri's law does not actually regulate any out-of-state transactions. Here, by contrast, the unrebutted record confirms that North Dakota's law does exactly that.

This Court can affirm on any of those bases, as North Dakota has not challenged the district court's holding that none of the challenged provisions is severable. What this Court should not do, however, is countenance North Dakota's unconstitutional effort to reshape a federal spending-power program.

## STATEMENT OF THE CASE

### A. Factual Background

1. Federal reimbursement of drugs furnished to Medicaid or Medicare beneficiaries accounts for "almost half the annual nationwide spending on prescription drugs." *Sanofi-Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). Access to that federally funded market is critical for drug manufacturers. But it comes with strings attached. In particular, manufacturers cannot sell their drugs on that federally funded market unless they agree to participate in the 340B Program, *see* 42 U.S.C. §§256b(a)(1), 1396r-8(a)(1), (5), which "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).

As that description reflects, Congress did not create 340B through its ordinary lawmaking power to impose obligations on regulated entities involuntarily. It almost certainly could not have; forcing manufacturers to sell their drugs at steeply reduced prices would raise serious constitutional concerns. *See Horne v. Dep't of Agric.*, 576 U.S. 350 (2015). Congress instead enticed manufacturers to enter the Program with the promise of access to the all-important federal Medicaid and Medicare Part B markets. The 340B Program thus is designed to "operate[] based on consent," *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022). And because manufacturer participation in Medicare, Medicaid, and 340B rise and fall

together, Congress must ensure that the benefits of participation in Medicare and Medicaid outweigh the burdens of participation in 340B—and prevent either from becoming unduly coercive. *Cf. NFIB v. Sebelius*, 567 U.S. 519, 581-82 (2012).

Manufacturers memorialize their consent to participate in 340B by executing a contract with the federal government known as a Pharmaceutical Pricing Agreement, or PPA. *Astra*, 563 U.S. at 115; *see* Sample PPA, https://tinyurl.com/4xbmd72k (last visited Aug. 14, 2026). PPAs "incorporate" a manufacturer's statutory "obligations and record [its] agreement to abide by" them, *Astra*, 563 U.S. at 118. PPAs include "nonrenewal and termination" provisions that entitle manufacturers to exit 340B "for any reason," and they "shall be construed in accordance with Federal common law." Sample PPA at 7, 9 (formatting altered).

The core command under both the 340B statute and the PPA is that manufacturers must "offer" certain outpatient drugs "for purchase at or below the applicable [federally defined] ceiling price," which is typically steeply reduced—indeed, sometimes as low as a penny per pill. 42 U.S.C. §256b(a)(1); *see* Sample PPA Addendum, https://tinyurl.com/3d4v326h (last visited Aug. 14, 2026). The manufacturer must extend that offer only to "covered entit[ies]," a statutorily designated list of 15 types of nonprofit healthcare providers. Sample PPA Addendum at 1; *see* 42 U.S.C. §256b(a)(4) (listing entities). While covered entities typically serve a high volume of uninsured and low-income patients, they do not

have to pass on to their patients the cost-savings they achieve by purchasing reduced-price drugs under 340B. They are instead free to sell to patients at full price the drugs that they purchased at the 340B price and then pocket the difference. So, while needy patients are supposed to benefit, the 340B Program most directly benefits covered entities.

The 340B Program also imposes obligations on covered entities to prevent them from exploiting manufacturers. Because covered entities can purchase drugs at steeply reduced prices, they could profit enormously from reselling to third parties at full price and pocketing the margin. Congress thus commanded that covered entities "shall not resell or otherwise transfer the drug to a person who is not a patient of the entity," a practice known as diversion. 42 U.S.C. §256b(a)(5)(B). Congress also forbade covered entities from generating "duplicate discounts," *i.e.*, claiming a 340B discount on a drug for which the manufacturer must pay a Medicaid rebate. *Id.* §256b(a)(5)(A). Together, these prohibitions are intended to "assure the integrity of the drug price limitation program." H.R. Rep. No. 102-384(II), at 16 (1992); *see also* 42 U.S.C. §256b(a)(5)(D).

2. Congress vested the Department of Health and Human Services ("HHS") with the responsibility to administer and enforce the 340B Program. HHS in turn delegated that responsibility to the Health Resources and Services Administration

("HRSA"). Among other 340B-related responsibilities, HRSA oversees two critical components of the 340B statute's enforcement regime: audits and dispute resolution.

The auditing process allows both HRSA and manufacturers to review a covered entity's records to verify that it is not diverting drugs or generating duplicate discounts. *See* 42 U.S.C. §256b(a)(5)(C). But a manufacturer can "conduct an audit only when it has documentation which indicates that there is reasonable cause" to believe that a covered entity violated those statutory prohibitions. 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). HRSA guidelines set a high bar to conduct an audit: Manufacturers must produce a detailed audit plan that "set[s] forth a clear description of [their] reasonable cause," identifies "sufficient facts and evidence," and supplies supporting documentation. *Id.* at 65,410.

Armed with whatever evidence the audit uncovers—assuming they can meet the prerequisites for conducting one—manufacturers present their evidence of program violations to an administrative dispute resolution ("ADR") panel, which decides whether the covered entity violated the statutory prohibitions against diversion or duplicate discounting. *See* 42 C.F.R. §§10.21, 10.23. The agency's final decision in those proceedings is subject to judicial review. *See id.* §10.23(c).

3. Congress designed the 340B Program to operate only through covered entities; pharmacies were not given any role in, or entitled to any benefits under, the Program. Some covered entities, however, ran into a logistical problem: Not all of

them had an in-house pharmacy through which they could dispense outpatient drugs. 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996).

To remedy that problem, HRSA issued guidance in 1996 authorizing each covered entity to contract with one outside pharmacy to dispense 340B-priced drugs. That guidance allowed covered entities to purchase the 340B-priced drugs but have them delivered to and dispensed by the pharmacy, so long as it was contractually their "agent" and the covered entity retained title to the drugs at all times. *Id.* at 43,550, 43,555. Although the guidance allowed covered entities to contract with one outside pharmacy, HRSA emphasized that "the use of contract services [would] only provid[e] those covered entities (which would otherwise be unable to participate in the program) a process for accessing 340B pricing." *Id.* at 43,550, 43,551. HRSA responded to concerns about diversion by stressing that manufacturers could "detect and eliminate" abuse through audits and the ADR process. *Id.* at 43,553.

4. In 2010, HRSA abruptly "swerved." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457 (D.C. Cir. 2024). It took the position that covered entities could contract with an unlimited number of outside pharmacies to dispense 340B-priced drugs, without regard to the proximity of the pharmacy to the covered entity (and its patients). 75 Fed. Reg. 10,272 (Mar. 5, 2010). The number of contract-pharmacy arrangements soon soared from roughly 1,300 in 2010 to upwards of 30,000 today. *See* Majority Staff Rep. of S. Comm. on Health, Educ., Lab. & Pensions, *Congress*

*Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 3 (2025), https://perma.cc/C83U-VRPX.

Federal watchdogs warned that this explosion heightened the potential for diversion and abuse in the 340B Program. U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 43-45 (2018), https://perma.cc/BK6S-WG5M ("2018 GAO Report"). For good reason. These arrangements increased the number of 340B price reductions claimed by covered entities far beyond any corresponding increase in their patient base. *See* Adam J. Fein, *New HRSA Data: 340B Program Reached $29.9 Billion in 2019*, Drug Channels (June 9, 2020), https://perma.cc/B759-WJTZ. Indeed, HRSA audits revealed that contract pharmacies accounted for nearly two-thirds of documented cases of diversion after that explosion began. 2018 GAO Report, *supra*, at 44. That stemmed in part from covered entities' failure to adequately oversee their contract pharmacies. *See id.* at 43-44. Despite HRSA's admonitions that "the covered entity" must be "ultimately responsible for assuring full compliance with 340B," 75 Fed. Reg. at 10,276, nearly one in three entities audited by the agency "had no documented processes for conducting contract pharmacy oversight," 2018 GAO Report, *supra*, at 44. And because neither covered entities nor their contract pharmacies are required to pass

along to patients the savings they realize from the 340B Program, both have strong incentives to classify as many transactions as possible as 340B-eligible.

The so-called product "replenishment model" that pharmacies use to acquire and dispense 340B-priced drugs on behalf of covered entities makes it even easier for them to do so. Under that model, contract pharmacies sell drugs from their general inventories to all customers at prices significantly above the 340B price, without making any inquiry into who is or is not a patient of a covered entity. After those transactions occur, the pharmacies use undisclosed algorithms that purport to retroactively identify customers that have some relationship with a covered entity. The pharmacies then use the covered entity's 340B status to replenish their inventory with drugs purchased at the 340B price. The covered entity, in turn, shares with the pharmacy part of the margin between the full-retail-price sale that the pharmacy made and the reduced price that the covered entity paid. *See* Supp.App.76, 25-cv-204.R.Doc.17-21 at 16.

All of this has proven extraordinarily profitable for major for-profit pharmacies. Both CVS and Walgreens have publicly disclosed that their 340B-derived profits are material to their finances—and that a reduction in 340B contract-pharmacy arrangements "could materially and adversely affect" them. CVS, *Annual Report (Form 10-K)*, 23 (2024), https://perma.cc/J5GD-WB5H; *accord* Walgreens, *Annual Report (Form 10-K)*, 30 (2024), https://perma.cc/YFA8-HNPE.

5. Eventually, manufacturers—including many of PhRMA's members—individually started trying to address these concerns by imposing conditions on their offers to sell their drugs to covered entities at 340B prices.[1] Although there were variations, two conditions became common features: Many manufacturers individually began requiring covered entities seeking to purchase their drugs at 340B prices to agree to (1) contract with no more than one outside pharmacy to dispense the drugs (and, under some manufacturers' policies, only if they did not have an in-house pharmacy), as HRSA originally envisioned, *see* p.10, *supra*, and (2) provide basic claims data about the transactions for which they claim 340B pricing, so the manufacturer can verify that no diversion or duplicate discounting has occurred.

In 2021, HRSA informed manufacturers that it believed that those conditions violated federal law. Litigation ensued over whether manufacturers could lawfully impose these contract-pharmacy and claims-data conditions on their 340B offers. Once the dust settled, manufacturers emerged victorious. Both circuits to weigh in on the issue agreed that federal law entitles manufacturers to impose the conditions that HRSA claimed were unlawful. *See Novartis*, 102 F.4th at 459-64; *Sanofi*, 58 F.4th at 703-06. Those decisions explained that the 340B statute preserves manufacturers' right to impose reasonable terms on their offers to sell drugs at 340B

[1] For information on many PhRMA members' policies, see 340B ESP, *340B ESP Resources*, https://perma.cc/46M7-GTPF (last visited Aug. 14, 2026).

prices—including restrictions on how many contract pharmacies a covered entity may use and requirements that covered entities supply claims data relating to 340B-priced drugs. *Novartis*, 102 F.4th at 459-64; *Sanofi*, 58 F.4th at 703-06. While both courts noted that refusing to allow a covered entity to use even *one* contract pharmacy may be so restrictive as to violate the obligation to make a *bona fide* offer to sell drugs at 340B prices, both courts emphatically rejected HRSA's position that the 340B statute forbids manufacturers from imposing the kinds of contract-pharmacy and claims-data conditions they had been imposing.

**B. Proceedings Below**

1. Refusing to take no for an answer, covered entities and their contract-pharmacy partners turned to lobbying states. Over the past few years, they began persuading states to pass laws that mandate under *state* law things that the Third and D.C. Circuits held *federal* law does not require. The first state to do so was Arkansas, which enacted a law ("Act 1103") that makes it unlawful for a manufacturer to:

> (1) Prohibit a pharmacy from contracting or participating with an entity authorized to participate in 340B drug pricing by denying access to drugs that are manufactured by the pharmaceutical manufacturer; or
>
> (2) Deny or prohibit 340B drug pricing for an Arkansas-based community pharmacy that receives drugs purchased under a 340B drug pricing contract pharmacy arrangement with an entity authorized to participate in 340B drug pricing.

Ark. Code §23-92-604(c).

PhRMA challenged that law in federal court, arguing that "Section 340B impliedly preempts Act 1103 through field and obstacle preemption." *McClain*, 95 F.4th at 1140-41. As to the former, PhRMA argued that the federal 340B regime is "so pervasive … that Congress left no room for the States to supplement it." *Id.* at 1143. As to the latter, PhRMA argued that Act 1103 frustrates Congress's intent to operate 340B as a "closed system" and interferes with Congress's chosen method of oversight. *Id.* at 1143-44. Relying on Arkansas's express assurance that its law governs "only … the **physical delivery** of the drugs" already purchased at the 340B price, Add.17, App.1343, 25-cv-81.R.Doc.83 at 17, not when drugs must be sold at 340B prices, this Court rejected the first argument by reasoning that "the text of 340B 'is silent about delivery' of drugs to patients." *McClain*, 95 F.4th at 1143. The Court then rejected PhRMA's obstacle-preemption arguments for much the same reason, concluding that, because Arkansas assured the Court that its law is focused only on delivery (an issue on which the Court concluded the federal 340B statute is "silent"), it vests state officials with "jurisdiction over different disputes" from those addressed by the 340B Program. *Id.* at 1143-44.[2]

[2] PhRMA also argued that Act 1103 makes it impossible for manufacturers to comply with the Federal Food, Drug, and Cosmetic Act's Risk Evaluation and Mitigation Strategies ("REMS") program. This Court rejected that argument too, holding that "Act 1103 does not force pharmaceutical manufacturers to violate REMS." 95 F.4th at 1145-46.

Notably, notwithstanding the position it took before this Court in *McClain*, Arkansas has recently advanced a different reading of its law in state court: In July 2026, Arkansas brought a lawsuit against 16 manufacturers (most of which are PhRMA members) arguing that they violated state unfair trade practices laws by refusing to *sell* drugs at 340B prices to covered entities that would not agree to the manufacturers' conditions on the use of contract pharmacies. *See* Compl., *Arkansas v. AbbVie, Inc.*, No. 57CV-26-84 (Polk Cnty. Cir. Ct. July 21, 2026).

2. Not long after this Court's decision in *McClain*, North Dakota passed its own law regulating participants in the federal 340B Program. As to contract pharmacies, H.B. 1473 makes it a crime for a manufacturer that participates in the 340B Program to "[d]irectly or indirectly deny, restrict, prohibit, or otherwise interfere with the acquisition of a drug"—defined as "a drug purchased under reduced pricing under Section 340B of the federal Public Health Service Act"—"by a contract pharmacy on behalf of a covered entity." N.D. Cent. Code §43-15.3-08(3)(a)(3), (b)(1); *see also id.* (defining "[c]overed entity" as "an entity participating or authorized to participate in a federal drug discount program under 42 U.S.C. 256b"). H.B. 1473 further prohibits "[i]nterfer[ing] with the ability of a covered entity or contract pharmacy to dispense a drug." *Id.* §45-15.3-08(3)(b)(4).

H.B. 1473 also contains two distinct prohibitions that Arkansas's law does not: It bars manufacturers from requiring "a covered entity or contract pharmacy to

submit any claims, encounter, or utilization data as a condition for acquiring or receiving a drug." *Id*. §45-15.3-08(3)(b)(3). And it forbids manufacturers from offering 340B pricing "in the form of a rebate, unless in the form of a discount at the time of sale and authorized under federal law." *Id*. §45-15.3-08(3)(b)(5).

North Dakota's Attorney General has the authority to prosecute violations of H.B. 1473 criminally, which as a class B misdemeanor carries a "maximum penalty of thirty days' imprisonment, a fine of one thousand five hundred dollars, or both." *Id*. §12.1-32-01(6). H.B. 1473 also allows the state Board of Pharmacy to impose civil penalties and seek injunctive relief. *Id*. §43-15.3-09(1)-(2).

3. Cognizant that this Court rejected its challenges to Arkansas's law on the theory that it regulates only post-sale delivery, not pre-sale conditions, PhRMA initiated litigation against North Dakota (initially in state court, but the state removed) seeking a judgment that North Dakota's law operates that way too. *See* 25-cv-204.R.Doc.1-1. In particular, PhRMA proposed reading H.B. 1473 to bar manufacturers only from refusing to deliver drugs that have already been purchased by a covered entity at the 340B price to the contract pharmacy of the covered entity's choice. So read, PhRMA explained, North Dakota's law would not bar its members' one-contract-pharmacy or claims-data policies, as those are conditions on when members will *sell* drugs at 340B prices, not conditions on where or how they will deliver drugs they have already sold. Instead of embracing that interpretation,

however, the state derided it as "meritless" and "too-cute-by-half," insisting that reading its law to cover only post-sale delivery restrictions "would render H.B. 1473 a nullity." Supp.App.131, 25-cv-204.R.Doc.21-1 at 43 (formatting altered). The state thus emphatically rejected the notion that its law operates how this Court concluded Arkansas's law operates.

Armed with that rejection, PhRMA argued that North Dakota's contract-pharmacy provisions are preempted even if Arkansas's are not. PhRMA also pressed as to North Dakota's law three arguments it did not press in *McClain* as to Arkansas's law. First, PhRMA argued that H.B. 1473 violates the Supremacy Clause itself, wholly apart from any statutory preemption, because states cannot single out "the Federal Government or those with whom it deals" for special obligations or prohibitions or directly regulate the federal government unless Congress expressly empowers them to do so. *Washington*, 596 U.S. at 838. Second, PhRMA argued that H.B. 1473's distinct claims-data and rebate provisions, which were not at issue in *McClain*, are preempted for reasons independent from its contract-pharmacy provisions. Third, it argued that H.B. 1473 directly regulates out-of-state transactions in violation of the Commerce Clause, as federal data show that roughly half of North Dakota covered entities' contract-pharmacy arrangements are with pharmacies *outside of North Dakota*. *See* App.1239-42; 25-cv-81.R.Doc.70-1 ¶¶10-14.

4. Before resolving the parties' cross-motions for summary judgment, the district court consolidated PhRMA's case with two challenges to H.B. 1473 filed by other manufacturers. 25-cv-204.R.Doc.44; *see AbbVie Inc. v. Wrigley*, No. 25-cv-81 (D.N.D.); *AstraZeneca Pharms. L.P. v. Wrigley*, No. 25-cv-182 (D.N.D.). The district court then granted PhRMA's motion in relevant part. Add.1-32, App.1327-58, 25-cv-81.R.Doc.83.[3]

The court first agreed with North Dakota that H.B. 1473 can*not* be read to prohibit only post-sale delivery conditions, and instead prohibits manufacturers from imposing "pre-sale conditions" on their 340B offers. Add.14-18, App.1340-44, 25-cv-81.R.Doc.83 at 14-18. For that reason (and others), however, the court then concluded that *McClain* does not control here. Add.16-18, App.1342-44, 25-cv-81.R.Doc.83 at 16-18. As it explained, a law that prohibits manufacturers from imposing "pre-sale conditions" (including claims-data conditions) on their 340B offers is "materially distinguishable from" a law that applies "only … to delivery," as *McClain* held Arkansas's law does. Add.17, App.1343, 25-cv-81.R.Doc.83 at 17;

[3] The court also granted AbbVie's motion for summary judgment in relevant part in the same order, and AbbVie is a co-Appellee in this Court. *See* Add.31, App.1357, 25-cv-81.R.Doc.83 at 31. AstraZeneca's case, consolidated below as well, is not on appeal because its claims arose in a different procedural posture; as to AstraZeneca, the district court denied the state's motion for judgment on the pleadings. Add.27-31, App.1353-57, 25-cv-81.R.Doc.83 at 27-31. AstraZeneca's case has been stayed pending resolution of these appeals.

*see McClain*, 95 F.4th at 1144-45. Moreover, PhRMA raised a number of distinct arguments that were neither pressed nor passed upon in *McClain*, including that H.B. 1473 is infirm under intergovernmental-immunity and spending-power principles. Turning to those arguments, the district court concluded that H.B. 1473 unlawfully "inhibit[s] the ability of the government to exercise its spending power by deterring manufacturers from participating in the program." Add.20, App.1346, 25-cv-81.R.Doc.83 at 20. By requiring "**only** 340B program participants to change their contracts with covered entities to what **the state** deems acceptable," the court explained, H.B. 1473 "changes [the] terms" of participation in the 340B Program. Add.20, 22, App.1346, 1348, 25-cv-81.R.Doc.83 at 20, 22. The court thus concluded that H.B. 1473 runs afoul of the Supremacy Clause. Add.22, App.1348, 25-cv-81.R.Doc.83 at 22.

The court also agreed with PhRMA that H.B. 1473 runs afoul of the Commerce Clause by directly regulating out-of-state transactions. Add.24, App.1350, 25-cv-81.R.Doc.83 at 24. The court thus granted summary judgment on PhRMA's Commerce Clause claim. And because PhRMA succeeded on the merits, the court concluded that the equitable factors (which North Dakota does not address before this Court) support PhRMA's request for permanent injunctive relief. Add.26, App.1352, 25-cv-81.R.Doc.83 at 26.

## SUMMARY OF ARGUMENT

As the district court correctly concluded, H.B. 1473 violates the Constitution because it expressly and exclusively targets participants and participation in a federal program. If a manufacturer were to drop out of the 340B Program tomorrow, it would shed H.B. 1473's constraints instantly. And if Congress ended the 340B Program tomorrow, North Dakota's law would cease to do anything. H.B. 1473 thus violates the Supremacy Clause under settled Supreme Court and Eighth Circuit precedent making clear that states simply do not have the power to directly target participants and their participation in federal programs.

North Dakota does not deny that its law regulates participants in the 340B Program alone. It instead claims that this Court has already blessed such targeting. But neither *McClain* nor *Hanaway* confronted (let alone resolved) an argument that the Constitution displaces state laws that "single out" for special state-law regulations the federal government or its partners, which includes participants in federal spending-power programs like 340B. *Washington*, 596 U.S. at 838-39; *Forest Park II*, 336 F.3d at 730-32. That constraint applies without regard to whether federal regulation is pervasive or state law conflicts with a specific federal command. Unless Congress expressly permits it—which North Dakota has never claimed the 340B statute does—targeting federal partners for special state-law burdens is prohibited, full stop. The spending-power principles on which the district

court relied buttress that conclusion. If Congress wants states to be able to impose additional conditions of participation in a federal spending-power program, it must give manufacturers clear notice that states have been empowered to do so. Again, North Dakota nowhere claims that the 340B statute does so.

Although those arguments were not presented in *McClain* or *Hanaway*, they are not foreign to this Court. This Court correctly applied them in *Forest Park II*, a case never discussed in *McClain* or *Hanaway* that is directly on point. Like here, there a state enacted a law that imposed restrictions on parties participating in a federal spending-power program. *Forest Park II*, 336 F.3d at 730. Like here, "apply[ing] a traditional preemption analysis" was complicated there by the "unique federal laws and programs involved." *Id.* at 731. Like here, the state argued there that the presumption against preemption put a thumb on the scale in its favor because the general subject matter of the federal program (and thus the state law) was a quintessential local issue. *Id.* Like the district court here, this Court there rejected the state's reliance on that presumption because what the state law actually regulated was a "relationship between a federal agency and" its program partners. *Id.* And like the district court here, this Court saw things there for what they were: "the quintessential case of the Supremacy Clause in action." *Id.* at 732. Legislative intent was "irrelevant"; the state law there was "preempted because it is inconsistent with the supremacy of the federal law made pursuant to the Constitution." *Id.* So too

here. "Simply, state statutes may not interfere with the implementation of a federal program by a federal agency. Federal law is supreme." *Id.*

That is not the only problem with North Dakota's reliance on *McClain* and *Hanaway*. Neither *McClain* nor *Hanaway* addressed (let alone blessed) a state law that *by the state's own admission* "prevents manufacturers from imposing restrictive policies and limitations" *not* on the terms of delivery to contract pharmacies, but on "the 340B pricing and sale agreements that they enter with North Dakota covered entities." N.D.Br.45-46 (emphasis omitted). Quite the opposite. Both cases were decided on the explicit premise that the laws at issue did *not* "enforce" 340B pricing. *McClain*, 95 F.4th at 1145; *see Hanaway*, 180 F.4th at 1113. Yet that is exactly what this law does, as the state itself has admitted throughout this litigation. And rightly so: By forcing manufacturers to sell drugs at 340B prices when federal law does not, H.B. 1473 enforces (and meddles with) 340B pricing. That distinction matters, because while this Court held that federal law does not speak to the delivery of drugs to pharmacies, it very much does speak to the terms on which manufacturers must sell their drugs to covered entities at 340B prices. H.B. 1473 thus runs afoul of the 340B statute even if the laws in *McClain* and *Hanaway* did not.

At the absolute least, this Court should affirm the judgment on the ground that the provisions of North Dakota's law that have no analogue in the Arkansas and Missouri laws inarguably conflict with federal law. H.B. 1473 prohibits

manufacturers from demanding the very 340B-specific data that the federal government has recently confirmed is necessary to deter and detect program abuse. It also prohibits manufacturers from effectuating 340B pricing via a post-dispensation rebate, which the federal government explicitly allows. There is no serious argument that either of those provisions has anything to do with where or how drugs will be delivered. All they do is regulate how manufacturers participate in, and sell drugs under, 340B in ways that directly conflict with the 340B Program. So, at the very least, those provisions are preempted. And because North Dakota has forfeited any challenge to the district court's holding that H.B. 1473 is inseverable, that dooms the entire statute and justifies affirmance across the board.

Finally, H.B. 1473 violates the Commerce Clause because it directly regulates wholly out-of-state transactions. *Hanaway* held that Missouri's law does not violate the prohibition on state laws directly regulating out-of-state transactions because it "applies only to the delivery of 340B drugs to covered entities and contract pharmacies *located in Missouri*." 180 F.4th at 1107 (emphasis added). Whatever may be true of Missouri's law, that is not the case here. North Dakota has never claimed that its law applies only to arrangements with in-state contract pharmacies. And PhRMA submitted undisputed evidence, which the district court credited (and North Dakota ignores), showing that roughly half of the 500-plus contractual arrangements between North Dakota covered entities and retail pharmacies are with

pharmacies located outside the state. So, even indulging the fiction that North Dakota's law regulates only "the delivery of 340B drugs," *Hanaway*, 180 F.4th at 1105, it directly regulates their delivery to pharmacies *outside the state*.

While PhRMA disagrees with *McClain* and *Hanaway* in many respects, there should be no disagreeing about this: Both the arguments and the law in this case are different from the arguments and laws in those cases. The district court correctly recognized as much in invalidating H.B. 1473. This Court should affirm.

## STANDARD OF REVIEW

Grants of summary judgment are reviewed de novo. *Davison v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007). Summary judgment is appropriate "when the evidence, viewed in the light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Johnson v. Exide Techs., Inc.*, 137 F.4th 676, 679 (8th Cir. 2025).

## ARGUMENT

### I. H.B. 1473 Unconstitutionally Rewrites The Terms Of Participation In A Federal Spending-Power Program.

The case presents a constitutional question that this Court did not confront in *McClain* or *Hanaway*: whether a state may impose its own obligations solely on participants in a federal spending-power program that is operated exclusively by the federal government. The answer is no. The Supreme Court has long held that the

Supremacy Clause by its own force forecloses state efforts to single out for special state-law obligations the federal government or those with whom it deals, directly regulate the operations of the federal government, or intrude on an exclusively federal field. By expressly and exclusively regulating participants and their participation in a federal program, H.B. 1473 does each of those things.

### A. The Supremacy Clause Forecloses State Efforts to Single Out Federal Programs and Their Participants for Special Restrictions.

1. The Supremacy Clause prohibits states from regulating the federal government, whether directly or indirectly. That rule, sometimes referred to as the "intergovernmental immunity" doctrine, "traces its origin to *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 [(1819)]." *GEO Grp. v. Newsom*, 50 F.4th 745, 754 (9th Cir. 2022) (en banc). As Chief Justice Marshall famously explained there, the "very essence of supremacy" is that the federal government can operate within its constitutionally assigned domain free from state meddling. *McCulloch*, 17 U.S. (4 Wheat) at 427. The Supremacy Clause itself, separate and apart from any congressional enactment, deprives states of the power "to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [national] government." *Id.* at 436.

Ever since *McCulloch*, the Supreme Court has consistently invalidated state action that violates that hierarchy. And the Court has treated with particular disapprobation state laws that single out for special obligations or prohibitions either

"the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838. Because such laws by design intrude into a federal sphere even when they implicate matters of traditional state concern, they are not subject to any presumption against preemption. To the contrary, the rule is that states *cannot* single out the federal government or its instrumentalities, contractors, or partners for special restrictions or obligations unless Congress "clear[ly] and unambiguous[ly]" empowers them to do so. *Id.* at 839-40.

*United States v. King County*, 122 F.4th 740 (9th Cir. 2024), is instructive. That case involved an executive order issued by a local government that forbade private businesses operating at a county airport from "providing … services to enterprises engaged in the business of deporting immigration detainees (except for federal government aircraft)." *Id.* at 748. As a result of the order, multiple businesses that had contracted with ICE to facilitate deportations had to cease providing services to the federal agency. *See id.* at 749, 756-57. The Ninth Circuit held the local order invalid because it "discriminates against the United States" by treating "contractors who serve ICE charter flights 'differently' from those who do not." *Id.* at 757. That conclusion did not turn on the strength of the federal interest in immigration regulation. It instead turned on the fact that the only entities regulated by the local order were private parties who served the federal government, which violates the Constitution's "anti-discrimination principle." *Id.*

Indeed, efforts to single out federal relationships for special regulation not only violate the nondiscrimination principle, but flout the rule that "the activities of the Federal Government [must be] free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). After all, when a state "mandates the ways in which [parties] render[] services" for which "the federal government" has contracted, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014), it is ultimately regulating the federal government itself. As the Ninth Circuit explained in *Boeing*, that too violates the Supremacy Clause. *Id.*; *see also, e.g.*, *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 328-29 (3d. Cir. 2025) (holding state law prohibiting private operation of immigration detention centers unconstitutional direct regulation of federal functions). In short, when it comes to "relationship[s] [that] originate[] from, [are] governed by, and terminate[] according to federal law," states have no power to add or alter the obligations the federal government has imposed unless Congress authorizes them to do so. *Forest Park II*, 336 F.3d at 731 (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

2. While many cases involving those principles arise in the context of federal procurement contractors, they apply equally in the context of federal spending-power programs. As the Supreme Court has put it, the Supremacy Clause prohibits state laws that single out for special burdens the federal government "or those with whom it deals (*e.g.*, contractors)." *Washington*, 596 U.S. at 838-39. As that "*e.g.*"

reflects, the doctrine is not confined to federal procurement contracts, or those in a formal "agency" relationship with the federal government. *Contra* Add.21, App.1347, 25-cv-81.R.Doc.83 at 21. For example, the Supreme Court has applied the doctrine to protect from discriminatory state regulation a private oil company "engage[d] in the commercial manufacture of ammonia on valuable industrial property leased from the Federal Government" because the oil company was the government's "lessee[]." *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 377-78, 387 (1960). Lessees are not procurement contractors or the federal government's "agents." Yet the Supremacy Clause nevertheless barred the state law at issue—because the law applied to the oil company solely by virtue of its relationship with the United States.

That makes eminent sense, as there is no principled reason for barring states from discriminating against those who agree to provide the federal government with goods or services or act as its agents, but giving them free rein to discriminate against those who agree to lease federal property, or to accept federal funds or benefits in exchange for taking on federally defined obligations. The point of the nondiscrimination principle is to protect the federal government itself, not to protect some particular subset of private parties through which it chooses to accomplish federal ends. The doctrine is triggered by state laws that single out federal *relationships* for disfavored treatment, as discriminating against someone because

they have entered into a relationship with the federal government necessarily deters others from doing so and ultimately increases federal costs. States thus cannot take that extraordinary step unless Congress says otherwise.

If anything, that rule applies *a fortiori* in the spending-power context. For one thing, the federal government always has a uniquely and dominant federal interest in appropriating federal funds, because the Constitution commits the spending power to federal control. *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366 (1943) ("When the United States disburses its funds …, it is exercising a constitutional function or power" that is "in no way dependent" on the law of any state.). Congress thus serves as "the custodian of the national purse." *United States v. Standard Oil Co.*, 332 U.S. 301, 314 (1947). By giving Congress that power, the Constitution ensures that "public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Because Congress alone may—and must—"define the limits" of federal spending-power programs, *Rust v. Sullivan*, 500 U.S. 173, 194 (1991), states cannot impose their own conditions on how such programs operate unless Congress explicitly invites them to do so, *see Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260-70 (1985). The contours of a "relationship [that] originates from, is governed by, and terminates according to

federal law" are for the federal government alone to delimit. *Buckman*, 531 U.S. at 347 (holding state regulation of federal regulatory program preempted).

That conclusion is reinforced by the independent clear-statement rule that governs participation in spending-power programs. Because "what is sometimes called the Constitution's Spending Clause" does not "endow Congress with [any] power to regulate conduct," *Landor v. La. Dep't of Corrs. & Pub. Safety*, 146 S.Ct. 1931, 1940 (2026) (alteration in original), "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "The legitimacy of" federal laws enacted pursuant to the spending power "thus rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* So "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*; *see also Landor*, 146 S.Ct. at 1940.

While that rule is usually articulated and applied in the context of spending-power compacts between the federal government and a state, the same principles apply to spending-power contracts between the federal government and private parties. In either context, if Congress wants to subject the recipient of federal funds to obligations or prohibitions for conduct that takes place entirely because of and entirely within the confines of the spending-power relationship, then it must "clearly

and unambiguously alert" participants of that intention. *Id*. at 1941. Participants in federal spending-power programs thus cannot be subjected to state-law restrictions on conduct that occurs solely because of their participation in a federal spending-power program unless Congress made explicitly clear that states have the power to impose such discriminatory restrictions. Sometimes Congress does so. For instance, when it comes to "cooperative federalism" programs like Medicaid, in which the state itself is a recipient of federal funds, Congress typically gives states a substantial role in regulating and administering the program; indeed, that is why they are known as *cooperative* federalism programs. *See, e.g.*, *PhRMA v. Walsh*, 538 U.S. 644, 650-51, 665 (2003) (plurality op.) (Medicaid). But unless Congress actually assigns states that role in a federal program, the Supremacy Clause forbids them from claiming it.

This Court recognized and correctly applied that principle in *Forest Park II*. That case involved a federal spending-power program that Congress created in the 1960s to promote low-income housing. The Department of Housing and Urban Development ("HUD") "enticed private developers" to build and maintain affordable multi-family housing by offering them loans with below-market interest rates. 336 F.3d at 728. In exchange for these federally subsidized mortgages, developers agreed to provide tenants with more affordable housing. *Id.* And to encourage participation, HUD allowed developers to buy out the mortgages early,

thus exiting the federal program and eliminating their obligation to provide pricing concessions. *Id.*

Though the federal-housing program gave states no role, Minnesota decided to enact its own restrictions to make it more difficult for participating developers to buy out their mortgages and exit the federal program. *Id.* at 730-31. The "unique federal laws and programs involved in [the] case ma[d]e it difficult to apply a traditional preemption analysis," *id.*, but this Court had no difficulty concluding that Minnesota's law violated the Supremacy Clause. As the Court explained, "[a] private participant in a federal housing program who seeks to withdraw from participation pursuant to the provisions of that program … is being prohibited by a state law from taking the action that the federal government has otherwise authorized." *Id.* at 731-32. And while Minnesota's law did not necessarily deprive the federal government of money on the mortgages (if anything, it may have done the opposite), its "effect" was to compel "the federal government to continue to provide financial assistance to the participant when both the federal government and the participant have chosen to end their relationship." *Id.* at 732. The law thus operated *exclusively* to "regulate[] or restrict[] the actions of" private participants in—and even "the federal government under"—"its own federal program." *Id.* That,

Minnesota could not do, even though that was not explicitly spelled out in a federal statute or regulation.[4]

*Forest Park II* did not use the term "intergovernmental immunity," preferring instead "the Supremacy Clause in action." *See id.* at 731-32. But nomenclature is not what matters. This Court correctly recognized that, when the federal government makes a deal with private parties to effectuate federal policy objectives, states cannot take it upon themselves to alter the terms of those deals unless Congress specifically says that they can.

To be clear, none of that means that agreeing to participate in a federal spending-power program is a get-out-of-state-law-free card. Participants in such programs ordinarily must comply with *generally applicable* state laws—*i.e.*, laws that are not confined to regulating participants in a federal program—unless Congress expressly or impliedly preempts them, because compliance with those laws is not conditioned on participation in a federal program. *See Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920). But if Congress wants to empower states to step into a federal spending-power relationship and impose their own conditions on

[4] This Court "also" held in the alternative that "the federal statutes and regulatory scheme" at issue there expressly and "impliedly preempt the state statutes because the state statutes conflict with the federal law." 336 F.3d at 733. But it did so only *after* first holding that the Supremacy Clause itself displaced the challenged state law. *See id.* at 731-32.

that program, then it needs to affirmatively say so. Congress cannot leave participants at risk of being blindsided by obligations to which they did not consent. That remains true regardless of whether a state law purports to regulate in an area traditionally reserved to the states, *see, e.g.*, *Forest Park II*, 336 F.3d at 727-30 (housing market), or whether a federal statute is "silent" on the issue a state wishes to regulate, *see, e.g.*, *CoreCivic*, 145 F.4th at 328 (holding a state law invalid under the Supremacy Clause even though no federal statute addressed the issue regulated by the state). In this context, "silence" dooms state regulation.

### B. H.B. 1473 Unconstitutionally Singles Out the Federal 340B Program and Its Participants for Special Restrictions.

Like *Forest Park II*, this case "presents the quintessential case of the Supremacy Clause in action." 336 F.3d at 731-32. As the district court correctly observed, H.B. 1473 does not regulate anything *other than* manufacturers' participation in the federal 340B Program. Add.19, App.1345, 25-cv-81.R.Doc.83 at 19. That is not open to serious debate. H.B. 1473 does not impose obligations or restrictions on all drug manufacturers that do business in the state. It applies only to the sale of a "[d]rug," a term defined entirely by reference to the federal 340B Program. N.D. Cent. Code §43-15.3-08(3)(a)(3); *see* p.16, *supra*. If a manufacturer does not participate in that federal program, then H.B. 1473 does not regulate it. But if a manufacturer *does* participate in 340B, then North Dakota imposes its own additional participation terms. Under H.B. 1473, a manufacturer that participates in

340B must refrain from making one-contract-pharmacy or claims-data conditions part of its federal 340B "offer." Whether that is understood as a regulation of price or of delivery, there is no denying that it is a regulation of participation in the 340B Program. Indeed, if Congress repealed the 340B Program tomorrow, then H.B. 1473 would no longer do anything. That is a classic case of "singl[ing] out" for special prohibitions "the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838, 840.

And H.B. 1473 does not just impose additional obligations on manufacturers that participate in the 340B Program. By imposing restrictions on the conditions manufacturers can impose on their federal offers to sell drugs at 340B prices—the same restrictions that two courts of appeals held federal law permits manufacturers to impose, *see Novartis*, 102 F.4th at 463-64; *Sanofi*, 58 F.4th at 703-06—H.B. 1473 rewrites the terms of their agreements with the federal government. A manufacturer's obligations under the PPA that governs its participation in the 340B Program is now effectively as follows: It "shall offer … covered outpatient drugs for purchase at or below the applicable ceiling price, [**and its offer may not include contract-pharmacy or claims-data conditions**]." Sample PPA Addendum at 1 (bolded text added). H.B. 1473 thus directly "regulates … the effective terms of [the] federal contract itself" by "mandat[ing] the ways in which [manufacturers]

render[] services" for which "the federal government" has contracted. *Boeing*, 768 F.3d at 840.

In short, H.B. 1473 explicitly and exclusively targets participants and participation in a federal program. Indeed, that is its *raison d'être*. North Dakota wants to prohibit manufacturers who participate in the 340B Program from doing what *Sanofi* and *Novartis* unanimously held federal law permits them to do. But "the Supremacy Clause does not permit [states] to take over a federal program just because they think they can do it better." *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991); *see also Forest Park II*, 336 F.3d at 731-32.

Although the district court endorsed that reasoning in full, it framed its ruling in terms of field preemption rather than intergovernmental immunity, on the theory that intergovernmental-immunity principles do not directly control here because "manufacturers are not agents of the federal government." Add.21, App.1347, 25-cv-81.R.Doc.83 at 21. While that is mistaken, *see* pp.28-29, it is a dispute that is ultimately more about semantics than about substance: Whether articulated in terms of "intergovernmental immunity," *see Washington*, 596 U.S. at 838-39, "the Supremacy Clause in action," *see Forest Park II*, 336 F.3d at 731-32, or "field preemption," *see PhRMA v. McCuskey*, 171 F.4th 675, 690-95 (4th Cir. 2026), *pet. for reh'g en banc granted*, 176 F.4th 830 (4th Cir. June 2, 2026) (mem.), the rule is the same: A state law that does nothing other than impose conditions on participants

and participation in a federal program in which states have been given no role cannot be squared with the Supremacy Clause.

**C. This Court's Prior 340B Cases Do Not Hold Otherwise.**

Instead of addressing these arguments head-on, North Dakota—in both its opening brief and its late-breaking motion for a stay pending appeal—insists that this Court already considered and rejected them in *McClain* and *Hanaway*. That is wrong. Those decisions had no occasion to consider these specific Supremacy Clause arguments because they were not made. And both cases confronted materially dissimilar laws in all events.

1. *McClain* and *Hanaway* addressed two interrelated preemption theories that were not the basis for the decision below. In *McClain*, PhRMA argued that (1) the federal 340B regime is "so pervasive … that Congress left no room for the States to supplement it"; and (2) that Act 1103 frustrates Congress's intent to operate 340B as a "closed system" and interferes with Congress's chosen method of oversight. 95 F.4th at 1143-44. This Court rejected those arguments because it concluded that Arkansas's law regulates only where drugs already purchased at the 340B price must be delivered, a question that it concluded federal law does not address. *Id.* at 1143-45. In *Hanaway*, Novartis likewise argued that Missouri's law is field preempted because "federal law established a standardized market for 340B drugs and vested sole enforcement power in the federal government," and that its "requirement that

manufacturers deliver 340B drugs to an unlimited number of contract pharmacies conflicts with Section 340B's prohibition on the diversion of 340B drugs." 180 F.4th at 1112-13. Because those same arguments were rejected in *McClain*, Novartis stated "that its field preemption argument [was] foreclosed" by the decision and argued that "*McClain* was wrongly decided and should be overturned." *Id.* at 1113. (Although Novartis argued that its conflict-preemption argument was new, this Court held otherwise. *Id.*)

Those are not the principal arguments that PhRMA made or the district court embraced here. The district court instead held that H.B. 1473 violates the Supremacy Clause because it imposes special obligations *only* on participants (and their participation) in the federal 340B Program. By requiring "**only** 340B program participants to change their contracts with covered entities to what **the state** deems acceptable," the court explained, H.B. 1473 "changes [the] terms" of the obligations of manufacturers who participate in that federal program. Add.20, 22, App.1346, 1348, 25-cv-81.R.Doc.83 at 20, 22. That impermissibly "inhibit[s] the ability of the [federal] government to exercise its spending power." Add.20, App.1346, 25-cv-81.R.Doc.83 at 20. On top of that, the district court concluded that North Dakota's law is "materially distinguishable" from the laws in those cases because it concededly does not apply "only … to delivery." Add.17, App.1343, 25-cv-81.R.Doc.83 at 17; *see McClain*, 95 F.4th at 1144-45. Whatever may be said of those

laws, North Dakota's own concessions confirm that H.B. 1473 effectively enforces 340B pricing by requiring manufacturers to sell drugs at 340B prices in circumstances where federal law does not. It thus not only changes the terms of participation in the 340B Program, but changes them in a way that this Court concluded Arkansas's (and Missouri's) law did not. Add.22-23, App.1348-49, 25-cv-81.R.Doc.83 at 22-23.

To be sure, as noted, the district court framed that holding in terms of field preemption rather than intergovernmental immunity. *See* Add.20-22, App.1346-48, 25-cv-81.R.Doc.83 at 20-22. But whether the argument is understood as an intergovernmental-immunity argument, a field-preemption argument, or a combination of the two, it is an argument that *McClain* (and *Hanaway*) "did not address," Add.16, App.1342, 25-cv-81.R.Doc.83 at 16—because no party in either of those cases argued that the Supremacy Clause bars states from enacting laws that single out participants and participation in federal programs unless Congress expressly authorizes them to do so. Indeed, neither decision even cited *Forest Park II*, let alone *Washington* or the nondiscrimination and direct-regulation principles it articulates. And it is hornbook law that earlier decisions "provide absolutely no support" for issues that were "not argued or decided in [those] cases." *United States*

*v. Bruguier*, 735 F.3d 754, 763 (8th Cir. 2013) (en banc); *see also, e.g.*, *Prince v. Kids Ark Learning Ctr.*, 622 F.3d 992, 995 n.4 (8th Cir. 2010) (per curiam).[5]

2. Any alleged similarities between North Dakota's law and the laws at issue in *McClain* and *Hanaway* do not change that conclusion. *Contra* N.D.Br.31-32. Even if one indulged the fiction that North Dakota's law is "virtually identical" to those laws, N.D.Br.24, H.B. 1473 would still violate the intergovernmental-immunity and spending-power principles on which the district court relied, as there is simply no denying that it imposes obligations on participants (and their participation) in the 340B Program alone. Because of H.B. 1473, participants in the 340B Program must do things they otherwise would not have to do (and would not do). That is the very essence of a discriminatory law.

At any rate, H.B. 1473 is *not* of a piece with the laws this Court confronted in *McClain* and *Hanaway*—even setting aside the fact that it includes provisions that those laws did not, *see infra* Part II. As the district court explained, despite some similarities between the contract-pharmacy provisions in H.B. 1473 and the

[5] Insofar as the state's reply brief repeats the argument advanced in its stay motion that *Hanaway*'s silence on intergovernmental-immunity and spending-power principles should be construed as implicitly considering and rejecting their relevance, *see* N.D.Stay.Mot.7-9, that is meritless for the reasons PhRMA explained in its stay opposition, *see* PhRMA.Stay.Opp'n.7-9; *see also United States v. Mitchell*, 271 U.S. 9, 14 (1926) ("It is not to be thought that a question not raised by counsel or discussed in the opinion of [a] court has been decided merely because it existed in the record and might have been raised or considered.").

Arkansas law in *McClain*, the two states have interpreted their laws "very differently." Add.17, App.1343, 25-cv-81.R.Doc.83 at 17. Again, in *McClain*, Arkansas insisted that its law governed "only … the **physical delivery** of the drugs" purchased at the 340B price. Add.17, App.1343, 25-cv-81.R.Doc.83 at 17; *see* Ark.Br., *PhRMA v. McClain*, 2023 WL 3010602, at *32-33 (8th Cir. Apr. 10, 2023). This Court accepted that representation (albeit over PhRMA's objection). *McClain*, 95 F.4th at 1143-46. And it was critical to the Court's holding, which rested entirely on its view that the 340B statute is "'is silent about delivery' of drugs to patients." *Id.* at 1143; *see also Hanaway*, 180 F.4th at 1112-14 (holding likewise as to Missouri's law).

North Dakota, by contrast, has insisted throughout this litigation—including on appeal, *see* N.D.Br.34—that H.B. 1473 regulates "pre-sale conditions … of drugs *available to be purchased* at 340B program prices." Add.18, App.1344, 25-cv-81.R.Doc.83 at 18 (quoting Supp.App.54, 25-cv-81.R.Doc.31-1 at 44). By North Dakota's own telling, H.B. 1473 forbids manufacturers from imposing contract-pharmacy (and claims-data) conditions on the "acquisition of a drug." *See* N.D. Cent. Code §43-15.3-08(3)(b)(1). Indeed, North Dakota rejected PhRMA's interpretation of H.B. 1473—which, in line with *McClain*'s understanding of Arkansas's law, would have limited H.B. 1473's reach to delivery—and asserted that such an interpretation "would render H.B. 1473 a nullity." Supp.App.53, 25-cv-

81.R.Doc.31-1 at 43; *see also* Supp.App.54, 25-cv-81.R.Doc.31-1 at 44 (reiterating that H.B. 1473 "unmistakabl[y]" regulates the conditions manufacturers may impose on their 340B offers before they sell drugs at the 340B price). By North Dakota's own lights, then, H.B. 1473 sweeps more broadly than this Court thought the Arkansas law in *McClain* did. *See* N.D.Br.45-46. As the district court correctly concluded, *see* Add.18, App.1344, 25-cv-81.R.Doc.83 at 18, H.B. 1473 controls the price at which drugs must be sold (340B versus non-340B), not how they must be delivered—or, in the words of *McClain*, it "enforce[s]" the 340B pricing that federal law "set[s]," 95 F.4th at 1145.

Neither *McClain* nor *Hanaway* held that a law that operates that way is consistent with the 340B Program, because both concluded that the laws before them did not. For that reason, too, those cases do not control this one. Indeed, if anything, they compel the conclusion that H.B. 1473 *is* preempted. While the state tries to deny it now, what H.B. 1473 actually does is dictate when manufacturers must sell drugs to covered entities at the 340B price. That is not the "practice of pharmacy," let alone a typical "health and safety" law. Without H.B. 1473, manufacturers could refuse to sell drugs at 340B prices to covered entities that decline their one-contract-pharmacy (and claims-data) conditions. *See Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06. By barring manufacturers from including those same federally permissible conditions in their offers to sell drugs at 340B prices, H.B. 1473 compels

manufacturers to *sell* drugs at 340B prices when they otherwise would not. That is the very sort of regulation and expansion of federal 340B pricing that *McClain* said *would* be preempted.

Indeed, North Dakota has never tried to explain how compelling additional 340B sales would *not* intrude on Congress's comprehensive regulation of that same subject. Nor could it. Under the state's view that H.B. 1473 "prevents manufacturers from imposing restrictive policies and limitations" on "the 340B pricing and sale agreements that they enter with North Dakota covered entities," N.D.Br.45-46, both H.B. 1473 and the federal statute regulate when a manufacturer must sell drugs at the 340B price. Accordingly, they both "operate upon the same object." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992) (plurality op.) (The "pre-emption analysis turns not on whether federal and state laws 'are aimed at distinct and different evils' but whether they 'operate upon the same object.'" (quoting *Napier v. Atl. Coast Line R. Co.*, 272 U.S. 605, 612 (1926)). Congress vested HHS with authority over that object to ensure that 340B would be administered "harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 120. H.B. 1473 upends that uniformity by targeting the exact same object. And by empowering state courts to enforce North Dakota's vision of the 340B Program, H.B. 1473 contributes to the very patchwork of "adjudication of rights" the Supreme Court held

was irreconcilable with the federal 340B statute. *Id.* at 119-20. For that reason, too, H.B. 1473 is preempted.

## II. At The Absolute Least, H.B. 1473's Distinct Claims-Data And Rebate Provisions Are Preempted.

Separate and apart from its contract-pharmacy provisions, H.B. 1473 contains two additional prohibitions that neither Arkansas's law in *McClain* nor Missouri's law in *Hanaway* includes. First, H.B. 1473 bars manufacturers from requiring "a covered entity or contract pharmacy to submit any claims, encounter, or utilization data as a condition for acquiring or receiving a drug." N.D. Cent. Code §43-15.3-08(3)(b)(3). Second, H.B. 1473 forbids manufacturers from offering 340B prices "in the form of a rebate" rather than "in the form of a discount at the time of sale," unless such post-dispensation rebates are specifically "authorized under federal law." *Id.* §43-15.3-08(3)(b)(5). To the extent this Court agrees with the arguments articulated above, there is no need to address these provisions separately; the whole statute is a direct assault on federal-program participation, so the whole statute falls. But these distinct provisions are preempted for distinct reasons too, as they squarely conflict with federal law and have nothing to do with "the issue of pharmacy distribution." *McClain*, 95 F.4th at 1143 (holding that the 340B statute does not preempt *that* field because it does not speak to "pharmacy distribution"). This Court can affirm the district court's judgment on these independent grounds.

### A. H.B. 1473's Prohibition on Claims-Data Conditions Is Preempted.

H.B. 1473's claims-data provision conflicts with federal law by frustrating manufacturers' ability to detect potential covered-entity (and contract-pharmacy) abuses of the 340B Program and access the ADR regime Congress designed as a bulwark against 340B abuse. *See, e.g.*, *PhRMA v. Morrisey*, 760 F.Supp.3d 439, 450-53 (S.D. W. Va. 2024) (holding state claims-data provision preempted on this basis); *AbbVie Inc. v. Drummond*, 808 F.Supp.3d 1266, 1277-78 (W.D. Okla. 2025) (same). That, in turn, frustrates HRSA's ability to police fraud and abuse in the 340B Program, as it deprives HRSA of the assistance that Congress wanted manufacturers to provide. Neither *McClain* nor *Hanaway* addressed a claims-data prohibition, because the state laws at issue in those cases do not contain one. But far from blessing them, the reasoning of both cases compels the conclusion that such provisions are preempted.

Under both *McClain* and *Hanaway*, the preemption question turns on whether Congress has legislated on the precise topic the state seeks to regulate: The Court concluded that state *delivery* restrictions are permissible because "Congress's decision not to legislate *the issue of pharmacy distribution* indicates that Section 340B is not intended to preempt th[at] field." *McClain*, 95 F.4th at 1143 (emphasis added); *see also id.* at 1144-45 (holding similar as to obstacle preemption); *Hanaway*, 180 F.4th at 1112-14 (holding likewise vis-à-vis both field and obstacle

preemption as to Missouri's law). The same cannot be said of manufacturers' ability to access claims data. The 340B Program expressly contemplates that manufacturers will help detect potential fraud and abuse by conducting audits of covered entities and bringing potential violations to HRSA's attention. 42 U.S.C. §256b(d)(3)(B)(iv). Yet federal law makes clear that manufacturers cannot participate in ADR unless they first audit a covered entity. *Id.* And manufacturers cannot simply conduct an audit of a covered entity whenever they wish: To conduct an audit, a manufacturer must provide "documentation" to HRSA establishing "reasonable cause" to believe that a covered entity is violating the prohibitions on diversion or duplicate discounting. 61 Fed. Reg. at 65,409.

That is no easy task even without laws like H.B. 1473, as HRSA requires manufacturers to produce a detailed audit plan that "set[s] forth a clear description of why [the manufacturer] has reasonable cause" and that identifies "sufficient facts and evidence in support of the belief." *Id.* at 65,410. But H.B. 1473's ban on claims-data conditions would be the final nail in ADR's coffin.

To audit for "duplicate discounts," manufacturers must have enough information about what prescriptions are at issue to provide HRSA with "reasonable cause" to suspect noncompliance. *Id.* at 65,409-10. So too with "diversion": A manufacturer must know what prescriptions the covered entity believes qualify for 340B pricing to determine whether the entity is correct. Manufacturers' policies

requiring provision of that data accord with widespread "business practices" and cover "standard information" readily available to covered entities. *Novartis*, 102 F.4th at 463. By prohibiting manufacturers from requiring covered entities to provide claims data, H.B. 1473 effectively eliminates manufacturers' ability to secure the "documentation" that is essential to initiate a 340B audit, thereby frustrating their ability to access ADR (and, perversely, increasing the oversight burden on HRSA). *See Morrisey*, 760 F.Supp.3d at 453.

That is not just a problem for 340B. Under the Inflation Reduction Act, HHS must "negotiate" with manufacturers "maximum fair price[s]" for certain drugs. 42 U.S.C. §1320f-3(a). Manufacturers must provide access to selected drugs at these so-called maximum fair prices, except when the drug is eligible for 340B pricing and the 340B price is lower. *Id*. §1320f-2(d). Avoiding duplicate price reductions requires manufacturers to identify when a drug is acquired at the 340B price—which requires claims data. *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Pricing Negotiation Final Guidance* 57-58, 60 (Oct. 2, 2024), https://perma.cc/Q8KB-LLYE. By prohibiting manufacturers from requiring covered entities to furnish that very data, H.B. 1473 makes it incredibly difficult (if not all but impossible) for manufacturers to avoid giving duplicate discounts, which will drive up the costs of participating in the 340B Program higher still.

This Court need not take PhRMA's word for it: HRSA just explained in a recently promulgated rulemaking that existing "audit-based" oversight may well be insufficient to effectively identify covered entity noncompliance, as "[t]he exponential growth of the 340B Program" has "strained [audit] capacity." 91 Fed. Reg. at 48,901. And HRSA highlighted in particular the problems posed by the massive expansion in contract pharmacies. *Id.* at 48,887. By making it substantially more difficult for manufacturers to conduct their own audits, H.B. 1474 exacerbates those problems. Moreover, as HRSA explained, when "covered entit[ies] must submit [to manufacturers] validated claims data" to receive 340B pricing, they experience "an inherent incentive for accurate reporting" that reduces "the opportunity for duplicate discounts." *Id.* at 48,901. North Dakota's law thus not only leaves manufacturers ill-positioned to detect violations of the federal 340B Program, but eliminates a tool that HRSA has found helps deter violations in the first place—thus frustrating the operation of Congress's enforcement scheme twice over.

It is no answer, as North Dakota suggested below, that federal law does not *require* manufacturers to impose claims-data conditions. *See* Supp.App.106-08, 25-cv-204.R.Doc.21-1 at 18-20. After all, if preemption existed only when it is impossible to comply with both federal and state law, then field and obstacle preemption would collapse into impossibility preemption. Nor does it matter whether H.B. 1473's claims-data provision makes it impossible, or just much harder,

to conduct audits or access ADR. Either way, it undeniably frustrates manufacturers' ability to exercise those federal rights. And it is black-letter law that obstacle-preemption problems do not disappear just because a state law may not entirely foreclose the operation of a federal regime.

State laws are obstacle-preempted if they stand as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), including when they pursue the same ends as Congress but do so via "conflicting means," *id.* at 379. So even assuming *arguendo* that H.B. 1473's claims-data provision shares the same ends as federal law in some general sense, there is no denying that North Dakota has adopted explicitly conflicting means to achieve them. By making it substantially more difficult for manufacturers to exercise the rights Congress gave them to help police for program violations, H.B. 1473's claims-data bar frustrates the enforcement regime that Congress designed and is therefore preempted.

### B. H.B. 1473 Conflicts With Federal Law By Criminalizing the Use of Rebates in the 340B Program.

H.B. 1473 also conflicts with the 340B statute by making it a crime to provide 340B pricing in the form of a rebate rather than an upfront discount—something that federal law expressly contemplates. Federal law expressly authorizes manufacturers to use rebates, 42 U.S.C. §256b(a)(1); 91 Fed. Reg. at 48,901, yet North Dakota makes it a crime to use rebates, N.D. Cent. Code §43-15.3-08(3)(b)(5). That is a

conflict, plain and simple. *See Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (finding federal and state laws in "irreconcilable conflict" where federal law "authorize[d]" conduct that state law "expressly forb[ade]").[6]

Below, North Dakota argued that this claim is barred by state sovereign immunity. Supp.App.115-16, 25-cv-204.R.Doc.21-1 at 27-28. But the state cannot assert sovereign immunity here because it is the party that invoked the jurisdiction of the federal court: PhRMA filed this action in state court, and North Dakota removed it to federal court. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 616, 618-24 (2002) (the state "waived its Eleventh Amendment immunity" by removing to federal court). Having voluntarily invoked the federal court's jurisdiction, it cannot use sovereign immunity to shield itself from PhRMA's claims. *See United States v. Metro. St. Louis Sewer Dist.*, 578 F.3d 722, 725 (8th Cir. 2009); *Skelton v. Henry*, 390 F.3d 614, 618 (8th Cir. 2004).

[6] North Dakota has asserted that "PhRMA *withdrew* its challenge to the rebate provision." N.D.Stay.Reply.9. That is false. As PhRMA explained in the notice the state cites, there was a brief period when the pilot program for manufacturers to effectuate 340B pricing via rebates was vacated, which meant the pilot program "no longer provide[d] a basis for enjoining H.B. 1473" "at th[at] time." Supp.App.59, 25-cv-81.R.Doc.65 at 2. But PhRMA explicitly "reserve[d] the right to reassert preemption" based on the pilot program "should HRSA implement a renewed version of that program," *id.*, which HRSA just did on August 3, *see* 91 Fed. Reg. 48,883. More to the point, PhRMA has always argued that H.B. 1473's provision "outlawing the use of the rebate model to provide the 340B price" conflicts with federal law because rebates are explicitly permitted *both* "under [the] federal statute *and* under … [the] Pilot Program." 25-cv-204.R.Doc.16 at 35-36 (emphasis added).

Nor can it try to paper over the blatant conflict by pointing to made-for-litigation declarations from its regulators disclaiming any "present intention" of enforcing the rebate prohibition. *See* Supp.App.102, 25-cv-204.R.Doc.21-1 at 14; Supp.App.141, R.Doc.21-3 ¶¶12, 15. This Court has made clear that such declarations do not suffice to defeat judicial review because the enforcement officials could "change [their] mind and enforce the law more aggressively in the future." *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019); *see, e.g.*, *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 915 (8th Cir. 2025) ("just because Bird has 'no present plan' to enforce the Act against Doe or Roe does not mean that she would not enforce it against them in the future"); *United Food & Com. Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 429-30 (8th Cir. 1988) (representation by state that it lacked "present intention" to enforce does not defeat jurisdiction where "the state's position could well change").

*   *   *

These deficiencies provide ample reason to affirm the judgment and injunction entirely. Although North Dakota argued below that the challenged provisions are severable, Supp.App.133, 25-cv-81.R.Doc.21-1 at 45, the district court rejected that argument, Add.25-26, App.1351-52, 25-cv-81.R.Doc.83 at 25-26. Because the state "presents no argument in its [opening] brief to rebut the district court's finding that the offending provisions in the [law] are nonseverable," it

"waived any challenge to the district court's severability determination." *XO Mo., Inc. v. City of Maryland Heights*, 362 F.3d 1023, 1025 (8th Cir. 2004). So this Court can "affirm the district court's judgment and hold [H.B. 1473] invalid in its entirety" on these independent grounds, *id.* But even if this Court were inclined to forgive the state's forfeiture and reject the arguments set forth in Part I, *supra*, there is no basis for upholding H.B. 1473's claims-data and rebate provisions.

## III. PhRMA Is Entitled To Judgment On Its Commerce Clause Claim.

Last year, this Court struck down a state drug-pricing law that "regulat[ed] the price to be paid in [another] state," even though all out-of-state sales to which it applied were upstream of an in-state sale. *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025); *see also Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666-71 (4th Cir. 2018) (similar). *Ellison* controls here. H.B. 1473 "directly regulates the amount and price of sales" occurring beyond North Dakota's borders. Add.24, App.1350, 25-cv-81.R.Doc.83 at 24. H.B. 1473 thus unconstitutionally "control[s] the price of wholly-out-of-state transactions." *Ellison*, 140 F.4th at 961.

North Dakota contends that, because it inures to the benefit of North Dakota covered entities, the statute merely has incidental effects on out-of-state commerce. N.D.Br.48. That is doubly wrong. As the state itself admits, "H.B. 1473 does not explicitly refer only to North Dakota covered entities." N.D.Br.45 n.14. And under no circumstances will a North Dakota court "add words or additional meaning to a

statute." *In re J.B.*, 959 N.W.2d 869, 871 (N.D. 2021). Regardless, even if this Court restricted the statute to North Dakota covered entities, "there are not two ways of reading this statute" with respect to contract pharmacies. Add.24, App.1350, 25-cv-81.R.Doc.83 at 24. On its face, H.B. 1473 directly regulates transactions with contract pharmacies that are beyond the state's borders—something North Dakota never denies. *See* App.1239; 25-cv-81.R.Doc.70-1 at 5 (roughly half of North Dakota covered entities' contract-pharmacy arrangements are with out-of-state pharmacies). That "directly regulates the amount and price of sales" of out-of-state transactions. Add.24, App.1350, 25-cv-81.R.Doc.83 at 24.

*Ellison* confirms as much. There, Minnesota argued that its drug-pricing law had no extraterritorial reach because it regulated only manufacturers whose drugs ended up in the state. 140 F.4th at 960. This Court rejected that argument, because what the law actually regulated was the price term of transactions between out-of-state manufacturers and out-of-state wholesale distributors. *Id.* at 960-61. The fact that those transactions had a tangential connection to Minnesota (because the drugs were destined for retail resale in Minnesota) made no difference. The Constitution forbids states from directly regulating the terms of transactions that occur wholly in other states. *Id.* at 961-92. Here, too, what H.B. 1473 does is require a manufacturer that more often than not (or always) will be out of state to provide drugs to a contract pharmacy that likewise often will be out of state, at a price dictated by North Dakota.

North Dakota "cannot, even in an effort to protect its consumers from … prescription drug costs, impose its preferences in this manner." *Id.* at 960.

*Hanaway* is not to the contrary. There, this Court rejected a Commerce Clause challenge to a Missouri law similar to H.B. 1473 on the premise that the Missouri law "applie[d] only to the delivery of 340B drugs to covered entities and contract pharmacies *located in Missouri*." 180 F.4th at 1107 (emphasis added). As explained, however, North Dakota's law is not so limited. And unlike in *Hanaway*, PhRMA submitted undisputed evidence showing that roughly half of the 500-plus contractual arrangements between North Dakota covered entities and retail pharmacies are with pharmacies *located outside the state*. App.1239; 25-cv-81.R.Doc.70-1 at 5. So, even accepting the premise that North Dakota's law regulates only "the delivery of 340B drugs," it directly regulates the terms under which 340B drugs will be delivered to contract pharmacies *located outside the state*. Unlike the "merely incidental effects on extraterritorial transactions" that this Court concluded the law in *Hanaway* concerned, 180 F.4th at 1107, H.B. 1473 "does not incidentally create a ripple effect on out-of-state actors," Add.24, App.1350, 25-cv-81.R.Doc.83 at 24. North Dakota's statute directly controls the terms on which drugs held by parties outside North Dakota must be delivered to contract pharmacies outside North Dakota, for sale to patients who likewise also outside North Dakota. That violates the Commerce Clause, as the district court correctly concluded.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Respectfully submitted,

s/Erin E. Murphy
ERIN E. MURPHY
*Counsel of Record*
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

August 20, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 12,998 words as determined by the word counting feature of Microsoft Word 2016.

Pursuant to Circuit Rule 28A(h), I also hereby certify that electronic files of this Brief and accompanying Addendum have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free.

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy